*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ALEXANDER/LEE/CANTU/THOMAS, Minors.

UNPUBLISHED
May 07, 2026
2:57 PM

No. 373356
Oakland Circuit Court
Family Division
LC No. 2021-882877-NA

Before: FEENEY, P.J., and GARRETT and BAZZI, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's orders terminating her parental rights to the minor children, SLA, KLA, LLL, LKWL, IKC, and ELT, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), MCL 712A.19b(3)(g) (failure to provide proper care and custody), and MCL 712A.19b(3)(j) (child will be harmed if returned to the parent).[1]  We affirm.

## I. FACTS

In February 2021, a petition was filed, requesting that the trial court terminate respondent's parental rights to the four oldest children: SLA, KLA, LLL, and LKWL.[2]  The petition alleged that

---

[1] Respondent had more children than the six discussed in this appeal—in 2011, respondent had her parental rights terminated to another child, and at the time that her parental rights were terminated in this case, she retained her parental rights to her most recent baby, WMD.  None of the children's fathers are parties to this appeal.  The trial court determined that IKC was born out of wedlock and that his biological father was deceased; LLL, LKWL, and ELT's legal father's parental rights were terminated in December 2023; and at the time that respondent's parental rights were terminated, SLA and KLA's legal father was undergoing termination proceedings and incarcerated with an earliest parole date of June 2026.

[2] At this point, IKC and ELT were not yet born.  The petition was later amended requesting temporary, opposed to permanent, wardship.

-1-

respondent: (1) had mental health concerns (she self-reported that she had Bipolar Disorder and Schizophrenia) that were going untreated; (2) did not have stable housing; (3) "demonstrated a pattern of unresolved neglect to her children"; (4) had a history of domestic violence; (5) had been investigated by the Department of Health and Human Services (DHHS) 17 times, with 5 of those investigations occurring in the last 11 months; (6) did not take DHHS's concerns seriously; (7) did not follow through with her recent referral to the Parent Education Program; and (8) had "one prior termination of parental rights [in 2011] due to a history of not complying with her Parent Agency Treatment Plan." The petition listed a plethora of reasonable efforts that had already been offered to respondent, including Ongoing Children's Protective Services (CPS) monitoring, Three Families First Interventions, Families Together Building Solutions, and a variety of referrals for parenting education, domestic violence resources, and material goods.

Throughout this case, respondent was married to LLL and LKWL's legal father, who had an extensive criminal history and was incarcerated for assaulting respondent in 2020 and again in 2023. Similarly, SLA and KLA's legal father was incarcerated for carrying a concealed weapon, felonious aggravated assault of a police officer, simple assault, domestic violence, three counts of obstructing and resisting a police officer, and two counts of possession of a weapon in the commission of a crime.

During the pendency of this case, respondent had three more children: IKC (2021), ELT (2022), and WMD (2024). Substance abuse became an additional barrier for respondent in December 2021, when IKC was born and tested positive for cocaine and amphetamines. Respondent missed many of her weekly drug screens, and the screens that she did take often tested positive for a mixture of cocaine, amphetamines, and methamphetamines. Respondent was unable to maintain stable employment or housing, and she continued to be in relationships with men who battered her, going so far as driving the children—with a suspended driver's license—to her boyfriend's house during a parenting-time visit. In April 2023, respondent was arrested at LLL and LKWL's legal father's residence—despite being aware that he was court ordered to have no contact with respondent as part of his parole conditions—for possession of crack cocaine. Respondent was incarcerated for about a month and a half, then she was sentenced to 36 months' probation and assigned to the adult treatment court. In May 2023, respondent's parenting time was suspended due to her inconsistent attendance at parenting-time visits, ongoing substance abuse, continued involvement with men who battered her, and her own incarceration.

Although respondent participated in various services—including housing programs, parenting time, parenting classes, mental health services, domestic violence counseling, drug screening, and an inpatient treatment program—throughout this case, her participation was "minimal" and "sporadic." The trial court found that although respondent exhibited moments of sobriety and stability, there was no consistency or long-term benefit from services; in fact, respondent's barriers had grown worse, and the pattern of substance abuse and domestic violence continued. Accordingly, the trial court found that there was clear and convincing evidence that at least three statutory bases existed for terminating respondent's parental rights and that termination was in the children's best interests. Respondent now appeals.

## II. SERVICE PLANS—REASONABLE EFFORTS

-2-

On appeal, respondent first argues that the trial court erred by finding that DHHS made reasonable efforts for reunification because DHHS failed to file the required case service plans in the trial court. We conclude that because DHHS: (1) fulfilled its statutory duty to prepare and update case service plans, and (2) offered respondent a plethora of services, the trial court did not plainly err by finding that reasonable efforts were made in this case.

## A. PRESERVATION AND STANDARD OF REVIEW

"[T]o preserve an argument about reasonable efforts for family reunification, a respondent-parent must object to the services at the time they are offered," which respondent failed to do in this case. *In re MJC*, 349 Mich App 42, 47; 27 NW3d 122 (2023). Therefore, this issue is not preserved. See *id*. "[U]npreserved issues are reviewed for plain error affecting substantial rights." *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021) (quotation marks and citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id*. (quotation marks and citation omitted). "The party asserting plain error bears the burden of persuasion with respect to prejudice." *In re MJC*, 349 Mich App at 48.

"This Court reviews de novo the trial court's interpretation and application of statutes and court rules." *Id*. "This Court's primary task in construing a statute . . . is to discern and give effect to the intent of the Legislature. The words used by the Legislature in writing a statute provide us with the most reliable evidence of the Legislature's intent." *Id*. (quotation marks and citations omitted). "Courts must give meaning to every phrase, clause, and word in the statute and, whenever possible, no word should be treated as surplusage or rendered nugatory." *Id*. (quotation marks and citation omitted). "Only when an ambiguity exists in the language of the statute is it proper for a court to go beyond the statutory text to ascertain legislative intent." *Id*. (quotation marks and citation omitted). "When determining the meaning of a statute's plain language, this Court examines the statute as a whole, reading individual words and phrases in the context of the entire legislative scheme." *Id*. at 49 (quotation marks and citation omitted).

## B. ANALYSIS

"In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal . . . ." *Id*. (quotation marks and citation omitted). "In addition to DHHS's duty to offer services to a respondent-parent, the respondent-parent has a duty to participate in and benefit from the services." *Id*. at 50. "Reasonable efforts to reunify the child and family must be made in all cases except if certain aggravating circumstances exist," and "[t]ermination is improper without a finding of reasonable efforts." *In re MJC*, 349 Mich App at 49-50 (quotation marks and citations omitted); see MCL 712A.18f(4). "As part of these reasonable efforts, the Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re MJC*, 349 Mich App at 50 (quotation marks and citation omitted).

" 'Case service plan' means the plan developed by an agency and prepared under [MCL 712A.18f] that includes services to be provided by and responsibilities and obligations of the agency and activities, responsibilities, and obligations of the parent." MCL 712A.13a(d). Notably, "[t]he case service plan may be referred to using different names than case service plan including, but not limited to, a parent/agency agreement or a parent/agency treatment plan and service agreement." MCL 712A.13a(d).

The requirements for a case service plan are found in MCL 712A.18f, which provides in relevant part as follows:

(2) Before the court enters an order of disposition in a proceeding under section 2(b) of this chapter, the agency shall prepare a case service plan that shall be available to the court and all the parties to the proceeding.

(3) The case service plan shall provide for placing the child in the most family-like setting available and in as close proximity to the child's parents' home as is consistent with the child's best interests and special needs. The case service plan shall include, but is not limited to, the following:

(a) The type of home or institution in which the child is to be placed and the reasons for the selected placement.

(b) Efforts to be made by the child's parent to enable the child to return to his or her home.

(c) Efforts to be made by the agency to return the child to his or her home.

(d) Schedule of services to be provided to the parent, child, and if the child is to be placed in foster care, the foster parent, to facilitate the child's return to his or her home or to facilitate the child's permanent placement.

(e) Except as otherwise provided in this subdivision, unless parenting time, even if supervised, would be harmful to the child as determined by the court under section 13a of this chapter or otherwise, a schedule for regular and frequent parenting time between the child and his or her parent, which shall not be less than once every 7 days.

(f) Efforts to be made by the supervising agency to provide frequent in-person visitation or other ongoing interaction between siblings unless the court determines under section 13a of this chapter that sibling visitation or contact will not be beneficial to 1 or more of the siblings.

(g) Conditions that would limit or preclude placement or parenting time with a parent who is required by court order to register under the sex offenders registration act.

(4) Before the court enters an order of disposition, the court shall consider the case service plan; any written or oral information offered concerning the child

from the child's parent, guardian, custodian, foster parent, child caring institution, relative with whom the child is placed, lawyer-guardian ad litem, attorney, or guardian ad litem; and any other evidence offered, including the appropriateness of parenting time, which information or evidence bears on the disposition. The order of disposition shall state whether reasonable efforts have been made to prevent the child's removal from his or her home or to rectify the conditions that caused the child's removal from his or her home. The court may order compliance with all or any part of the case service plan as the court considers necessary.

(5) If a child continues in placement outside of the child's home, the case service plan shall be updated and revised at 90-day intervals . . . . The agency shall consult with the foster parents when it updates and revises the case service plan, and shall attach a statement summarizing the information received from the foster parents to the updated and revised case service plan. Updated and revised case service plans shall be available to the court and all the parties to the proceeding. [MCL 712A.18f(2) through (5).]

Accordingly, DHHS must prepare an initial case service plan before the trial court enters an order of disposition, MCL 712A.18f(2), and DHHS must prepare an updated case service plan at 90 day intervals if the child continues in a placement outside of the child's home, MCL 712A.18f(5).

Even though this case involved three separate orders of disposition and proceeded for over three and a half years, only three service plans were filed with the trial court: (1) an October 18, 2021 updated service plan titled "Parent Agency Treatment Plan," which respondent signed; (2) an October 16, 2023 updated service plan titled "Case Service Plan"; and (3) an October 16, 2023 updated service plan titled "Parent Agency Treatment Plan," which respondent signed. See MCL 712A.13a(d). On appeal, petitioner argues that although the required case service plans were not all filed, they did all exist. In support of this argument, petitioner has provided the first few pages to initial service plans for ELT and IKC, as well as 13 updated case service plans for the timeframe between December 2021 and November 2024.

This is not a case in which DHHS failed to prepare and update case service plans. Cf. *In re MJC*, 349 Mich App at 56-58. Instead, DHHS prepared and updated case service plans pursuant to MCL 712A.18f(2) and (5), and the parties—who stated their possession of the reports throughout the proceedings, including after the trial court's statutory-basis findings—simply failed to move for their admittance.[3] Moreover, DHHS *did* offer significant services and made adequate efforts toward reunification including, *inter alia*, individual therapy, parenting classes, parenting time, domestic violence counseling, substance abuse testing, and a variety of referrals for employment and housing assistance. The record is clear that respondent was offered a plethora of services—she simply failed to consistently engage in, or benefit from, them. As the trial court indicated, despite being offered various services, respondent continued to abuse substances and be

---

[3] At oral argument, the lawyer-guardian ad litem (LGAL) emphasized that the COVID-19 pandemic impacted this case, which started in February 2021, as they were conducting Zoom hearings for approximately two years; this shed light on the absence of reports being printed and filed.

with partners who perpetrated violence against her. Accordingly, because DHHS: (1) fulfilled its statutory duty to prepare and update case service plans, and (2) offered respondent a plethora of services, the trial court did not plainly err by finding that reasonable efforts were made in this case.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Respondent further argues that all three of her trial counsels[4] provided ineffective assistance by failing to object to the lack of case service plans. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because respondent did not move the trial court or this Court for a new trial or evidentiary hearing on the issue of ineffective assistance of counsel, respondent did not preserve this issue for appellate review. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020); *People v Sabin (On Second Remand)*, 242 Mich App 656, 658; 620 NW2d 19 (2000). "[U]npreserved issues are reviewed for plain error affecting substantial rights." *In re Sanborn*, 337 Mich App at 258 (quotation marks and citation omitted).

## B. ANALYSIS

"It is well established in Michigan jurisprudence that the law governing ineffective assistance of counsel in the context of criminal proceedings applies by analogy to termination proceedings." *In re MJC*, 349 Mich App at 58-59. "Therefore, reversal would be warranted if it is shown that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance prejudiced the respondent." *Id*. at 59 (quotation marks and citation omitted). Even if respondent's attorneys' failure to move for the admittance of the case service plans constituted deficient performance, respondent's claim of ineffective assistance would nevertheless fail because respondent cannot establish prejudice. See e.g., *id*. Any error did not prejudice respondent because, as previously stated: (1) the case service plans existed, and (2) respondent was offered adequate services but simply failed to consistently engage in, or benefit from, them.

## IV. STATUTORY GROUNDS

Respondent further argues that considering the lack of reasonable efforts in this case, the trial court erred by finding that statutory grounds had been proven by clear and convincing evidence. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because the trial court addressed and decided the question whether sufficient evidence was presented to establish a statutory ground for termination of respondent's parental rights, this issue is preserved for appellate review. See *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). "A court may terminate a respondent's parental rights if one or more of the statutory grounds for

---

[4] Respondent's first and second counsel withdrew their representations in the trial court.

termination listed in MCL 712A.19b(3) have been proven by clear and convincing evidence." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). We review the trial court's determination for clear error. *Id*. "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. at 41 (quotation marks and citation omitted). "We give deference to the trial court's special opportunity to judge the credibility of the witnesses." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009).

## B. ANALYSIS

Respondent briefly argues that considering the lack of reasonable efforts in this case, the trial court erred by finding that statutory grounds had been proven by clear and convincing evidence. But as previously stated, respondent was offered adequate reasonable efforts in this case; she simply failed to consistently engage in, or benefit from, them. Respondent's parental rights were terminated under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), MCL 712A.19b(3)(g) (failure to provide proper care and custody), and MCL 712A.19b(3)(j) (child will be harmed if returned to the parent). Considering that this case lasted for over three and a half years, during which DHHS offered services, the court tracked respondent's progress or lack thereof, and respondent continued to abuse substances and be with partners who perpetrated violence against her, the trial court did not clearly err by finding these statutory bases for terminating respondent's parental rights. The testimony revealed that respondent had a source of income, but her lack of progress in overcoming her substance use and domestic violence issues, coupled with her lack of emotional stability that interfered with her ability to be consistently present for her children even before visits were suspended, precluded her from providing a safe, stable, non-neglectful home for her children.

## V. BEST INTERESTS

Respondent further argues that the trial court: (1) failed to evaluate each child individually, and (2) erred by finding that termination of respondent's parental rights was in the children's best interests. The lawyer guardian ad litem also argues that considering respondent's recent progress and the lack of permanency plans for the four oldest children, the trial court erred by finding that termination of respondent's parental rights was in the four oldest children's best interests. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because the trial court addressed and decided the question of the children's best interests, this issue is preserved for appellate review. See *In re TK*, 306 Mich App at 703. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App at 40. "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We review the trial court's determination for clear error. *In re Olive/Metts Minors*, 297 Mich App at 40.

## B. ANALYSIS

"In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). At the best-interest stage of the proceeding, the trial court's focus is on the child, not the parent. *In re Moss*, 301 Mich App at 87. "Although in most cases it will be in the best interests of each child to keep brothers and sisters together . . . , if keeping the children together is contrary to the best interests of an individual child, the best interests of that child will control." *In re Olive/Metts Minors*, 297 Mich App at 42 (quotation marks and citation omitted). It is "incumbent on the trial court to view each child individually when determining whether termination of parental rights is in that child's best interests." *Id*. at 42. Moreover, this court has stated that

> the fact that the children are in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination was in the children's best interests. A trial court's failure to explicitly address whether termination is appropriate in light of the children's placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal. [*Id*. at 43 (quotation marks and citation omitted).]

As an initial matter, when making its best-interest findings, the trial court specifically acknowledged that "[e]ach child requires an individual best interest analysis." The trial court then considered each of the children's individual bonds, or lack thereof, with respondent. Regarding the possibility of adoption and the children's need for permanency and stability, the trial court found that although ELT and IKC were in relative placements, their placements were preadoptive and termination was in their best interests. See *id*. The trial court further found that although LLL and LKWL were not in a preadoptive home, adoption may happen in a more reasonable amount of time than reunification with respondent would. The trial court also determined that although SLA and KLA were not in a preadoptive placement, they needed permanence, and regardless of the outcome of their father's termination proceedings, respondent was not a viable alternative for permanence and stability. Considering that this case had already proceeded for over three and a half years, the trial court did not clearly err in these findings. See *id*. at 40.

Notably, at the conclusion of the best-interest hearing, the LGAL argued that termination of respondent's parental rights was only in the two youngest children's best interests considering that: (1) respondent had turned a corner with her sobriety, (2) respondent was bonded with the four oldest children, and (3) although the four oldest children's placements were stable, they were not definitively final. Although it is unusual for the trial court to not follow the LGAL's recommendations, there is no obligation to do so. Even respecting the LGAL's objection to termination of the four oldest children due to a lack of preadoptive placement, the trial court carefully considered the children's stated desires, lack of bond, and need for permanence in making its determination for all the children's best interests. For example, the trial court noted that the four oldest children had witnessed or experienced significant domestic violence in respondent's home, and they did not see respondent as the person who provides them with safety, care, and

stability. In addition to the domestic violence that these children experienced in respondent's home, they had also experienced respondent's inconsistency throughout the three-and-a-half-year pendency of this case. Indeed, the evidence established that although these children had a bond with respondent, that bond became more tenuous as respondent's parenting time remained suspended. Moreover, the trial court specifically acknowledged that SLA and KLA did not have a desire to live with respondent.

The trial court reiterated that respondent's parenting time was suspended due to her substance abuse, continued involvement with men who battered her, and her own incarceration. And the trial court reasoned that respondent's continued involvement in domestic-violence filled relationships and her decision to have more children during the pendency of this case was very telling of her poor decision-making skills. The trial court stated that although respondent periodically complied with her services, she "was non-compliant more than she was compliant," and although her most recent behavior was closer to compliance, "[h]er success does not translate to the immediate or relatively soon return home for the children." Indeed, although respondent's recent success was observed while her parental rights were still intact for her most recent baby, WMD, the return of four to six children to respondent's care would undoubtedly place a much greater responsibility on her during a time that the trial court found she needed to focus on her sobriety and consistency. The trial court reasoned that maintaining sobriety was just the beginning of respondent's journey, and the children could not wait for respondent to address all her barriers and consistently demonstrate that she is able to parent. The trial court explained that the children needed "stability and permanence to break the cycle."

Accordingly, the trial court considered a variety of factors, it properly focused on best interests from the children's perspectives, and did not clearly err by finding that termination of respondent's parental rights was in the children's best interests. See *id*.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Mariam S. Bazzi

-9-